IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SHARI CHASE, et al.          :

v.                           :   Civil Action WMN-01-3169

THE SCOTTS COMPANY           :
                             :

**MEMORANDUM**

This is a products liability action in which Plaintiffs Mark and Shari Chase allege that as a result of their use of "Patchmaster," a lawn care product manufactured by Defendant, The Scotts Company, Shari Chase was arsenic poisoned. Defendant has filed two motions to exclude the testimony of Plaintiffs' experts, Paper No. 17 (to exclude the testimony of Richard Albright, Esquire) and Paper No. 18 (to exclude the testimony of Dr. John Adams). Defendant has also filed a motion for summary judgment. Paper No. 19. All of the motions are fully briefed. On September 24, 2002, the Court held a hearing on these pending motions and heard testimony from one of Plaintiffs' proffered experts, Richard Albright. Upon a review of the pleadings, the evidence in the record, the argument of counsel, and the applicable case law, the Court determines that the motions to exclude testimony will both be granted in part and denied in part, and the motion for summary judgment will be denied.



**I. FACTUAL BACKGROUND**

Plaintiffs resided in a single family home on Shannon Avenue in Laurel, Maryland from 1987 to 1999. Mark Chase took primary responsibility for maintaining the lawn around the family home. Beginning in the early 1990s, he began regularly using Patchmaster, a product designed to re-seed bare spots. It consists of approximately 70% paper mulch, 20% fertilizer, 10% grass seed, and trace amounts of green dye and surfactant. Mark Chase estimates that he applied between three and eight 15-pound bags of Patchmaster every year, generally to the same areas of his lawn that for reasons of drainage or use, were frequently bare. Plaintiffs report that the product typically worked very well.

In the fall of 1997, Mark Chase purchased a number of bags of Patchmaster on sale. In the spring of 1998, he applied the product from at least six of these bags to his lawn. Unlike his previous experience with the product, however, it was not effective and grass did not grow where this batch of Patchmaster was applied. Also in the spring of 1998, Shari Chase personally applied Patchmaster to bare spots on as many as ten occasions.

Shari Chase's physical ailments began in May of 1998, and included rashes, gastrointestinal effects and neurological disorders. Her health became progressively worse until she

suffered a seizure in October 1998. She was initially hospitalized at the Laurel Regional Hospital, but was later transferred to Johns Hopkins Hospital in Baltimore. In November 1998, after several weeks of hospitalization and extensive testing, Shari Chase was diagnosed as suffering from arsenic poisoning. Mark Chase and one of the couple's children, Alexander, also exhibited elevated urinary arsenic levels.

Once the determination was made that arsenic was the cause of Shari's symptoms, officials from the Prince George's County Health Department and the Maryland Department of Health began an investigation. The Health Department tested the interior of the home and found no significant source of arsenic. Investigators did not initially focus on the yard. Shortly thereafter, however, Plaintiffs' homeowners' insurer had some testing done. While that testing confirmed that there were no elevated levels of arsenic in the drinking water or elsewhere inside the home, two samples from the yard showed elevated levels. One sample taken on December 11, 1998 showed an arsenic level of 249 ppm. A second sample collected on December 28, 1998 which included "green chunks of fibrous material" showed an arsenic level of 430 ppm. Pls.' Ex. 11. The Court understands that the normal background arsenic level for this geographic region is about 2 ppm, and the EPA standard requiring clean up for residential properties is 43 ppm for arsenic in soil. See Albright Aff. at ¶

8.

After receiving the results of that testing, Shari Chase contacted Scotts to report that its Patchmaster product might contain elevated levels of arsenic. Scotts retained Datanet Engineering to do additional soil testing. W. Warren Wright of Datanet went to the Chase home and took additional soil samples. When collecting those samples, he noticed a green residue in the yard, and noted that the grass was not growing at the place in the yard where a mat of this residue appeared. Samples from the areas where Plaintiffs indicated Patchmaster had been applied yielded arsenic concentrations of 229 ppm, 357 ppm, 395 ppm and 607 ppm.

Additional testing of the soil was conducted by Bell Environmental and its employee, Robert Ehlenberger, in May 1999 at the request of Plaintiffs. In areas where Shari Chase indicated Patchmaster had been applied, Ehlenberger observed remnants of the green "papier-mache binder." Ehlenberger Dep. at 28. Samples taken from those areas yielded elevated arsenic levels as high as 171 ppm and 233 ppm.

## II. MOTIONS TO EXCLUDE EXPERT TESTIMONY

The Court's determination of whether expert opinion testimony may be introduced is governed by Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier

>of fact to understand the evidence or to
>determine a fact in issue, a witness
>qualified as an expert by knowledge, skill,
>experience, training, or education, may
>testify thereto in the form of an opinion or
>otherwise, if (1) the testimony is based upon
>sufficient facts or data, (2) the testimony
>is the product of reliable principles and
>methods, and (3) the witness has applied the
>principles and methods reliably to the facts
>of the case.

These last three factors were added to Rule 702 to codify the Supreme Court's holding in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Daubert instructs the district court to assume the role of a "gatekeeper," in that it must make an initial determination as to whether an expert's testimony is reliable and relevant. See, e.g., Westberry v. Ab, 178 F.3d 257, 260 (4th Cir. 1999) (citing Daubert, 509 U.S. at 590-92 & n. 9). The trial court is given substantial discretion to decide how to make this determination. See Westberry, 178 F.3d at 261. The Supreme Court in Daubert suggested factors such as testing, peer review, error rates and the general acceptance of the theory when courts are reviewing the reliability of "scientific" theory and scientific methods. The Daubert factors are not meant to be exhaustive or exclusive, however. See, Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149-150 (1999).

In Kumho Tire, the Supreme Court expanded Daubert's "gatekeeping" principle to technical and other specialized knowledge, noting that this expansion may merit the consideration

of factors other than those set forth in Daubert. In fact, as the Supreme Court held in Kumho Tire, the Daubert factors "do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged." Id. at 149. The ultimate objective of the court's preliminary determination is to ensure that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Id. at 152.

Mr. Albright has been offered as an "environmental specialist, with specific expertise in arsenic and the routes of exposure of arsenic to humans." Pls.' Opp. to Mots. to Exclude at 2. Plaintiffs acknowledge that Albright's qualifications as an expert witness are somewhat unusual as they come more from his professional experience, than from his academic training. Although trained as an attorney and having practiced as an attorney for many years, since 1995, Albright has been employed as an Environmental Specialist with the District of Columbia, Department of Health, Bureau of Hazardous Materials and Toxic Substances. In that role, Albright is the District of Columbia official responsible for overseeing environmental remediation of all military sites in the District, including a site that is ranked as one of the most severely toxic military sites containing arsenic in the United States. See Albright Aff. at ¶

5. Albright is not without some academic qualifications, as well. In 1980, Albright earned a Masters degree in Special Studies, with a major in Environmental Science from George Washington University.

Plaintiffs would have Mr. Albright render the following opinions:

> 1) Arsenic at the high levels reported in the back yard of the Chase's home posed an imminent and substantial threat to health, through the routes of exposure of inhalation and ingestion both of inorganic arsenic and methylated arsenic compounds;
>
> 2) Arsenic contamination found in the back yard of the Chases' home most likely came from the unintended contamination of Patchmaster, based on his knowledge that arsenic is a known contaminant of fertilizers such as those found in Patchmaster. The source of arsenic was not pressure treated wood in the Chases's back yard with the exception of minor elevations at one sample taken from right under the deck and one area by the wooden gate;
>
> 3) Based upon the timing of the exposure and the symptoms complained of by Shari Chase, a number of those symptoms are compatible with arsenic exposure as reported in the scientific literature; and
>
> 4) Organic compounds in the Patchmaster could combine with inorganic arsenic in the fertilizer, along with the actions of fungi and bacteria in the soil, to produce toxic compounds.

Pls.' Opp. to Mots. to Exclude at 8-9.

From the pleadings and the testimony of Mr. Albright presented at the September 24, 2002 hearing, the Court is

satisfied that he is qualified to render Opinions (1), (2), and (4) and that his testimony as to those issues would be relevant and reliable. His work experience related to the remediation of toxic sites containing high levels of arsenic provides him an adequate basis upon which to express opinions as to background levels of arsenic in the environment, other potential sources of arsenic in the environment, and the levels at which arsenic becomes dangerous. His opinion as to the chemical behavior of arsenic and arsenic compounds in the soil, Opinion (4), is based upon reputable studies contained in the scientific literature. See Albright Exh. F. While Albright would not appear to be the most qualified expert to expound on the specifics of the chemical reactions involved -- whether, or to what extent, these reactions occur would be issues that he would need to consider in connection with his professional responsibilities.

The Court must add that it will impose some limitations on the scope of Albright's expert testimony as to Opinion (2). His expertise and experience with arsenic in the environment would allow him to offer opinions that would rule out certain alternative explanations for the elevated arsenic level in the Chase lawn, such as the pressure treated wood deck and fence. He can certainly testify that arsenic is a known contaminant in fertilizer products, at least in trace amounts (a fact which is not contested) and relate his experience in that regard. Where

the Court grows uncomfortable with Albright's testimony, however, is where he goes on to opine that "hot spots" in phosphate mines were responsible for extremely elevated levels of arsenic in the Patchmaster purchased by the Chases. Based upon the record before the Court, Albright does not appear to have any scientific basis for that opinion and, absent some basis, he cannot so testify.[1]

As to proffered Opinion (3), the Court finds that Albright is not qualified to render any portion of that opinion. Plaintiffs are forthright in acknowledging that "Mr. Albright does not pretend to be a medical doctor, toxicologist or chemist." Pls.' Opp. to Mots. to Exclude at 32. A diagnosis of Shari Chase's condition based upon her symptoms is clearly a medical issue reserved for the expertise of a qualified medical doctor, not Mr. Albright. Accordingly, the Court will grant Defendant's Motion to exclude Mr. Albright's testimony as to that opinion testimony.

Dr. Adams is a medical doctor with a specialty in Forensic Medicine and Pathology. Plaintiffs would have Dr. Adams render

---

[1] The Court notes that Albright's "hot spot" theory goes more to how the product came to be defective, not whether the product was defective. Plaintiffs have no burden to explain what in the manufacturing process of a particular product gave rise to the defect, they must simply establish that the product, as manufactured, was defective. See Phipps v. General Motors Corp., 278 Md. 337, 343 (1976)(observing that it would place an "often impossible burden" on plaintiffs to prove the specific act that lead to the defect).

the following opinions:

> 1) Shari Chase was exposed to high levels of arsenic in her environment during the six to twelve months preceding the beginning of the winter of 1998 that resulted in multi-system injury from chronic arsenic poisoning, some of which persists;
>
> 2) Testing results show that Mark Chase and Alexander Chase were also exposed to high levels of arsenic;
>
> 3) The current scientific literature may not explain all aspects of the event, but individual variation in absorption and metabolism of arsenic is known to exist and defining the factors of an individual's sensitivity to arsenic is just beginning in medical science;
>
> 4) With reasonable medical probability, the source of Shari Chase's poisoning was a lawn contaminated with arsenic, with probable multiple routes of exposure including ingestion, respiration and dermal exposure;
>
> 5) Within a reasonable medical probability, given the strong association between sampling and test results from the Chase yard, the source of the arsenic that poisoned Shari Chase was from the Patchmaster product; and
>
> 6) Based on the available evidence, there is no indication of tampering or other alteration of the Patchmaster product, and within a reasonable probability, the arsenic in Patchmaster as produced by Scotts was the source of Shari Chase's arsenic poisoning.

Pl.'s Opp. to Mots. to Exclude at 8-9.

Defendant does not disagree that Dr. Adams has adequate qualifications to express the opinion that arsenic was the cause of Shari Chase's health problems. Def.'s Reply at 6. Nor does

Defendant challenge Dr. Adams's qualifications to opine that it was arsenic in the lawn that was the source of the poisoning. Id. Where Defendant takes issue with Dr. Adams's qualifications is where he offers his opinion as to the source of the arsenic in the lawn, i.e., that the elevated arsenic levels in the lawn were the result of the application of Patchmaster, and that the Patchmaster purchased by the Chases was unaltered and un-tampered with, so that the Patchmaster, as produced by Defendant, must have contained these elevated levels of arsenic.

The Court agrees that Dr. Adams should be prohibited from offering his Opinions (5) and (6). These opinions are so clearly outside the scope of his expertise as a medical doctor, that it is frankly difficult to understand Plaintiff's arguments to the contrary. Reviewing the portion of Plaintiffs' pleadings that purport to address this issue, see Pls.' Opp. to Mots. to Exclude at 43-50, most of the argument goes to Dr. Adams's qualification to opine that Shari Chase's arsenic exposure came from arsenic in the soil (something about which Defendant concedes Dr. Adams is qualified to opine) and not that there was arsenic in the Patchmaster. The Court will grant Defendant's motion to exclude the testimony of Dr. Adams as to his Opinions (5) and (6).

While Defendant concedes that Dr. Adams is qualified to render the opinion that arsenic in the soil in her back yard was

11

the cause of her poisoning, Defendant challenges the opinion itself as unsupported. Defendant's primary contention is that the level of arsenic in the Chase lawn was simply too low to account for the levels of arsenic observed in Shari Chase's hair and urine. See Def.'s Mot. at 26-31; Reply at 20-23. Defendant also notes that Shari Chase's arsenic level remained abnormally high, even after she left her home and went into the hospital. Defendant has submitted the testimony of its own expert in support of both contentions. See Affidavit and Report of Glenn Millner, Def.'s Exh. 34.

Dr. Adams, however, has pointed to studies reporting that there are wide variations in the manner in which individuals respond to arsenic exposure, and that there are many unknown variables affecting a person's susceptibility to arsenic. He also identified studies reporting elevated levels of arsenic in urine as long as two months after cessation of exposure. While Defendant's experts undoubtedly disagree with the conclusions draw from these studies reflecting atypical responses to arsenic, Adams's opinions are supported by the medical and scientific literature. See Adams Affidavit and Report and accompanying exhibits.

### III. MOTION FOR SUMMARY JUDGMENT

Plaintiffs bring common law causes of action in strict

liability, negligence, and breach of warranty, as well as a statutory claim under Maryland's Consumer Protection Act, Md. Code Ann, Com. Law § 13-408(a). To recover on a theory of strict liability in Maryland, a plaintiff must establish:

> 1) the plaintiff was the user or consumer of an alleged defective product;
>
> 2) the defendant was the seller of the product and at the time of sale was engaged in the business of selling such a product;
>
> 3) at the time of sale the product was defective;
>
> 4) the product reached the plaintiff without substantial change in the condition in which it was sold;
>
> 5) the defect made the product unreasonably dangerous to the plaintiff; and
>
> 6) the defect proximately caused plaintiff's injuries.

Shreve v. Sears, Roebuck & Co., 166 F.Supp.2d 378, 406-07 (D. Md. 2001). The elements of proof are essentially the same for claims under theories of negligence or breach of warranty. Id. at 406.

In moving for summary judgment, Defendant contends that Plaintiffs are unable to establish two of the requisite elements: the existence of a defect, and medical causation. More specifically stated, Defendant asserts that Plaintiffs have insufficient evidence from which a jury could find:

> 1) That Scotts Patchmaster, as produced by

>       Scotts, was the source of the elevated
>       arsenic found in the Chases' backyard; and
>
>       2) that the arsenic in the Chases' backyard
>       was the source of Shari Chase's arsenic
>       poisoning.

Def.'s Reply at 1-2.

As to the first issue, the Court concludes that, even apart from any expert testimony on that point, there is sufficient evidence to get to the jury. Several of the individuals that collected soil samples from the Chases' yard observed green fibrous material that looked very much like Patchmaster, and when those samples were tested, they contained unusually high levels of arsenic. That there was something defective about the last batch of Patchmaster purchased by the Chases is bolstered by their testimony that, unlike their previous experience with the product, this time, it would not grow grass. While, as Defendant is quick to observe, the correlation between areas with high arsenic levels and areas where the Chases applied Patchmaster is not perfect,[2] the correlation is sufficiently high that a

---

[2] Some areas where Plaintiffs indicate they applied Patchmaster did not test high for arsenic, and other areas where Patchmaster was not applied, did. There is sufficient evidence in the record, however, to account for the inconsistencies. For example, the Patchmaster was applied from several different bags. There is no reason to conclude that all bags of the product were contaminated, or contaminated equally. Shari Chase also testified that one of the areas that tested high for arsenic but was not a site of application was a site that the partially used bags of Patchmaster were stored. See Ehlenberger Dep. at 42-43.

14

reasonable jury could conclude that the Patchmaster was the source of the arsenic.

As to the second issue, Dr. Adams's opinion, if embraced by the jury, is sufficient for the jury to conclude that the arsenic that poisoned Shari Chase was the arsenic from her back yard. The jury may find, of course, that the reasoning and conclusions of Defendant's experts are more plausible. In which case, it will find for the Defendant. It is not for this Court, however, to engage in that weighing.

## IV. CONCLUSION

At the hearing on these motions, both parties acknowledged that this is a very unusual case. The Court wholeheartedly concurs. It is undisputed that, under normal circumstances, Patchmaster is not supposed to contain anywhere near the level of arsenic that it would have needed to contain in order to create the level of arsenic found in the soil sampled from the Chases' yard, and there is no ready explanation in the record as it now stands as to how it could have come to contain that much arsenic. And yet, the green fibrous material found in the Chases' yard that almost certainly is the Patchmaster product contained arsenic levels as high as 600 ppm. It is undisputed that, under normal circumstances, arsenic levels even as high as those found in the Chases' yard should not have led to the levels of arsenic

found in Shari Chase's body. And yet, those levels were found in Shari Chase's urine and hair and, after extensive testing of her environment, no other source of arsenic was found.

The Court recognizes that Plaintiffs face a formidable task in proving their case. But as this Court has observed on another occasion, Defendant has "confused what may be in its estimation a weak jury case for one appropriate for summary judgment." <u>Reed v. Sears, Roebuck & Co.</u>, 934 F.Supp. 713 (D. Md. 1996). Viewing all the evidence in the light most favorable to the Plaintiffs, and drawing all reasonable inferences in their favor, as must be done at this stage in the litigation, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986), the Court concludes that a jury could find that the Patchmaster product purchased by the Chases in the fall of 1997 contained unreasonably high levels of arsenic and that this Patchmaster was the source of the arsenic that poisoned Shari Chase.

A separate order consistent with this memorandum will issue.

_____
William M. Nickerson
Senior United States District Judge

Dated: October 15, 2002